[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Review of the File
This matter first came to the court by summons and complaint dated November 1, 1999 and returnable December 7, 1999, in which complaint the plaintiff petitioner sought a dissolution of the marriage, joint legal custody of the minor children with the primary residence being with the plaintiff, child support, an equitable property settlement, an assignment of the defendant's estate in and to the jointly owned real estate located at 29 Pequot Trail, Jewett City pursuant to the provisions of the statute, and such other equitable relief as the court might deem appropriate.
Accompanying the complaint were the usual automatic orders of the court. Accompanying the complaint was a motion for joint custody and support pendente lite. also a motion for exclusive use and possession of family residence pendente lite. The sheriff's return was attached thereto.
On December 3, 1999 the defendant appeared by counsel and on the same date counsel for the defendant filed an answer to the complaint, a defendant's motion for custody, support and alimony pendente lite, and an objection to the plaintiff's motion for exclusive use and possession of the family residence.
On the same date, December 3, 1999, the defendant filed his claims for relief as follows: custody of the minor children, support for the minor children, alimony, property settlement, exclusive use and possession of CT Page 15723 the marital residence located at 29 Pequot Trail in Griswold, an assignment of the plaintiff's right, title and interest in and to the aforementioned real estate, an allowance to defend, an equitable property settlement and such other relief as the court might deem equitable and proper.
On January 10, 2000 the plaintiff filed a further motion for exclusive possession pendente lite.
On January 18, 2000 the Court, Kenefick, J., appointed counsel for the minor children in the person of Attorney Krista Dunn.
On January 20, 2000 the defendant filed an objection to the plaintiff's motion for exclusive use and possession of the family home.
A motion was filed on February 28, 2000 requesting that the defendant contribute to household expenses.
On March 2, 2000 the defendant moved for an order of temporary alimony as against the a plaintiff.
On March 9, 2000 the plaintiff filed a motion for temporary joint custody and support of the minor children.
On March 17, 2000 the defendant filed a motion for exclusive use and possession of the family residence pendente lite.
On April 5, 2000 Attorney Krista Dunn filed an appearance on behalf of the minor children.
On April 25, 2000 the defendant filed a pendente lite motion for contempt and for an accounting. The file reflects that the matter was not acted upon.
On May 1, 2000 this file was referred to Family Services as concerns matters of custody.
On May 22, 2000 the plaintiff filed a motion for the appointment of a guardian ad litem pendente lite for the minor children and on June 7, 2000 Attorney Tammie Gildea was appointed in that capacity.
On June 1, 2000 the plaintiff filed a motion as concerns summer vacation and visitation pertaining to the minor children pendente lite.
On July 20, 2000 the defendant filed a further motion for alimony, custody and child support pendente lite and this motion was the subject CT Page 15724 of an order by the Court, Dyer, J., on August 7, 2000.
On July 20, 2000 the plaintiff filed a motion for release of funds pendente lite incident to securing funds to enable her to make a purchase of a home and residence for herself. The motion contained an agreement that the requested sum; to wit, $20,000.00, would be factored into the overall property settlement.
On August 7, 2000 there was filed a document entitled "Agreement", which bore a date of June 23, 2000, having to do with the parenting arrangement as concerns the minor children issue of the plaintiff and the defendant. This agreement bears the signatures of both the plaintiff and the defendant and their respective counsel as well as the signature of the attorney for the minor children.
The agreement was approved by the Court, Dyer, J.
On August 7, 2000 there was filed a document entitled "Stipulation", bearing the date of July 12, 2000, incident to an agreement between the parties relative to modification of the automatic orders and allowing the plaintiff to withdraw a sum certain from her 401K incident to the purchase of a home.
This stipulation was approved by the Court, Kenefick, J.
On August 11, 2000 the defendant filed a further pendente lite motion for contempt and for an accounting as concerns claims by the defendant as to the use or withdrawal of funds by the plaintiff without order of the court. It does not appear that this motion was acted upon.
On August 14, 2000 the plaintiff filed a motion for a vocational evaluation pendente lite requesting that the defendant undergo a vocational evaluation.
This motion was granted by the Court, Kenefick, J., on August 28, 2000.
On September 20, 2000 the defendant filed a motion for contempt and sanctions and for the return of personal property pendente lite. It does not appear that this motion was acted upon.
On October 18, 2000 the Court, Kenefick, J., entered an order of child support payable to the defendant from the plaintiff in the amount of $230.00 per week.
The court also entered an order of pendente lite alimony in the amount of $50.00 per week payable to the defendant from the plaintiff. This CT Page 15725 order also indicated the dates on which the payments were due, the same being retroactive to September 3, 2000, that the defendant was to be responsible for all expenses of the family home and unreimbursed medical, dental and child care expenses shall be apportioned 60% to the plaintiff and 40% to the defendant.
Financial affidavits were filed by both the plaintiff and the defendant on October 18, 2000.
On November 2, 2000 the defendant filed a motion for release of records, which was granted by the Court, Kenefick, J., on November 6, 2000.
On November 21, 2000, November 22, 2000 and November 28, 2000 the plaintiff and the defendant with their respective attorneys, the attorney for the minor children and their respective witnesses appeared before the court and the matter was heard to a conclusion. Note: The defendant did not attend the last day of the proceedings allegedly due to his teaching obligations
The Court makes the following findings of fact.
The court notes that at the beginning of the testimony in this proceeding, the attorney for the minor children as guardian ad litem, Tammie Gildea, did not appear. It being represented to the court that her contact with the parties or the children had been minimal and that her presence was not required nor mandated.
The plaintiff, whose maiden name was Hamel, and the defendant were joined in marriage at Providence, Rhode Island on May 26, 1985.
Both parties have resided in Connecticut for more than one year prior to the initiation of these proceedings.
It appears that the marriage between the parties has broken down irretrievably with no reasonable prospect for reconciliation.
The plaintiff and the defendant have two minor children issue of this marriage those names are Nicole Creaturo, born September 7, 1989, and Megan Creaturo, born September 7, 1989.
No other minor children have been born to the plaintiff since the date of the marriage of the parties.
Neither party is now nor have they been in the past the recipient of welfare or assistance from the state or any town, city or municipality or CT Page 15726 subdivision thereof.
As noted earlier, the parties had resorted to the assistance of Family Relations and the Early Intervention Program.
The plaintiff and the defendant entered into a parenting arrangement which was reduced to writing and dated June 23, 2000 and is Plaintiff's Exhibit 1 in these proceedings.
The agreement will be dealt with at greater length further on in this memorandum. Basically the agreement provided for joint legal and physical custody of the two minor children.
The plaintiff testified and the court finds that the access and visitation schedule mentioned above has been working out well.
The plaintiff testified and the court finds that the two minor girls are doing very well in school, that the children participate in the drama club and in sports.
The plaintiff has participated in and volunteered in activities pertaining to the children, matters pertaining to parent-teachers activities, games, sports and so forth.
The plaintiff attends any and all medical appointments for the children.
The plaintiff acknowledged that in terms of child care that the defendant is a good father and that the children appear to have an abiding love and affection for the defendant.
The plaintiff and the defendant separated in September of 2000.
Initially when the plaintiff moved out of the family residence, she resided in a neighbor's home temporarily. This was after September 30, 2000.
The plaintiff was able to have access to her new home and residence October 30, 2000.
The plaintiff has been employed as an informations technologist at Pfizer's for the last three years.
The plaintiff has had prior employment at an entity known as New Wave in New London and prior to that was with the United States Naval Undersea Laboratories for 13 years. CT Page 15727
The plaintiff credibly testified that in domestic activities prior to the separation that she did all of the grocery shopping, took care of all financial arrangements, did the laundry, cleaned the home and that according to the plaintiff, the defendant contributed minimally in household activities and requirements.
The plaintiff testified and the court finds that difficulties arose between the parties during the years 1996 and 1997, that the parties did not get along well and that were verbal altercations.
The plaintiff testified and the court finds that during the 1996-1997 time frame that the defendant showed evidence of being depressed, that the defendant was unhappy in his career choice as an electrical engineer.
In 1991 the defendant, according to the plaintiff, embarked upon a course to secure a teaching certificate for Connecticut.
The plaintiff testified that it appeared that the defendant was unhappy for a considerable period of time in the electrical engineering arena.
The plaintiff characterized the home life of the parties as unhappy.
The plaintiff endeavored to be supportive of the defendant but characterized the defendant as having no interest in her career.
The parties did not verbally communicate well one with the other, matters of physical intimacy suffered.
In January of 1999 the plaintiff sought help and assistance at the William Backus Hospital in Norwich for counseling.
The plaintiff testified that the defendant has had a relatively long term friendship with a neighbor by the name of Robin, that the defendant and this lady exchange presents,. that the defendant sees this lady every morning and every evening, that the lady has given gifts to the defendant. The plaintiff being troubled by this asked the defendant to participate in counseling but the defendant declined.
After June of 1999 the defendant no longer gave the plaintiff one-half of his paycheck which had been the practice in prior months.
The plaintiff testified that she paid all of the mortgage payments, she paid utilities, the phone, clothing for the children. The plaintiff testified that she had at one point a retirement fund with Fidelity in which $17,000.00 of her assets reposed, portions of which she used for CT Page 15728 domestic shortfalls and expenses because of the defendant's actions.
The plaintiff's testimony was to the effect that the defendant did not financially contribute to the financial situation of the parties during the period October 1999 to November 2000.
The plaintiff testified that the defendant did not pay for household expenses, that the plaintiff asked for a contribution but that the defendant declined.
The plaintiff discussed the domestic problems with members of her family.
The plaintiff testified that the defendant's friend, Robin, has filed for a dissolution of her marital union as of August 2000.
The testimony by the plaintiff was to the effect that in prior court proceedings pertaining to this petition that the friend Robin would come to court each time with the defendant.
The plaintiff testified that after changing his position from being an electrical engineer to becoming a teacher that the defendant seemed happier but that the relationship between the plaintiff and the defendant continued to deteriorate.
The defendant is age 39.
From the testimony it appears that his health is excellent.
The plaintiff testified that the defendant was very creative, particularly in matters pertaining to computers and their systems.
During a portion of the marriage, before the defendant entered the teaching arena, the incomes of the parties were substantially similar.
While the plaintiff was at the entity known as New Wave, at one point in time her income was a the neighborhood of $62,000.00. Her income now is substantially in excess of that at her position with Pfizer's. That issue will be addressed later in the memorandum.
The plaintiff has a bachelor's degree in electrical engineering and a master's degree in computer science.
The plaintiff testified that on four occasions the defendant ran up substantial credit card debt that she felt was not justified and required efforts on her part to pay off these debts in order to maintain financial stability. CT Page 15729
The plaintiff testified that the defendant promised that he would not resort to conduct of this nature again but did not keep his word.
The plaintiff acknowledged that the marriage has irretrievably broken down and that no reconciliation of the parties is possible.
The plaintiff testified that there were four incidents during the life of the marriage where the defendant in her words "physically harassed her".
The plaintiff testified that the defendant had slammed her around and verbally harassed her and spoke to her in an offensive manner and in profane words
The plaintiff testified that on one occasion the defendant spit in her food and threatened to destroy the family dog.
The plaintiff testified that on occasion the defendant would stalk her and that on one occasion the child Megan had to intervene between the parties.
The plaintiff testified that on one occasion the defendant hit her with a cupboard door. On some of these occasions the children would be present.
The plaintiff testified that on one occasion the defendant tried to run her off the road while the parties were in different automobiles. The children at that time being with the plaintiff in the vehicle she was operating.
The plaintiff testified that the children were concerned or apprehensive with regard to the defendant hurting the plaintiff. It appears that the situation is much better at the present since the separation of the parties.
The plaintiff testified that her moving out of the family residence was to ensure a smooth transition for the sake of the children.
After moving out of the family residence, the plaintiff purchased a property on 21 Chiou Drive in Jewett City.
The purchase price according to her testimony was $195,900.00.
The plaintiff transferred certain monies from her 401K to be able to make the requisite down payment to ensure the purchase of the home. CT Page 15730
The plaintiff characterized the two 11-year old girls as mature for their age.
The family residence at 29 Pequot Trail, where the defendant presently resides, was purchased in 1987. The price was $132,000.00. The mortgage undertaken at that time was $129,000.00.
This property has been appraised. The exhibit will be referred to. The value being $147,000.00. There is a First mortgage of $26,700.00 and a second mortgage of $4,226.00.
The second mortgage comes due in four years. The monthly payment on the second mortgage is $200.00.
The plaintiff has a 1999 Mitsubishi Eclipse automobile.
The defendant has a 1995 Ford Windstar.
The plaintiff has certain stock options which may be exercised beginning in February 2001; thereafter, April 2002, and subsequent years.
The Fidelity Fund asset of the plaintiff was from her prior employment at the government undersea water facility in Groton.
By virtue of prior order of the court, the plaintiff now pays the defendant $230.00 in child support and $50.00 a week in alimony.
The plaintiff testified that she was waiving the right to make a claim for alimony as against the defendant.
The funds for counsel for the plaintiff came from a loan from her sister and is reflected on her financial affidavit.
The plaintiff acknowledged the love that the defendant has for his children, that he took one month off for a maternity leave at the time that the children were born.
The plaintiff testified that after the birth of the children that the parties agreed that there would not be any other children of this union and incident thereto the defendant undertook a vasectomy
It appears that the defendant decided in 1991 to embark upon the career of being a teacher. Since he has entered that avocation as a teacher, the defendant does not work during the summer school vacation months. CT Page 15731
The plaintiff's position is to the effect that the plaintiff and the defendant shared equally most of the burdens of the childcare.
The plaintiff acknowledged that at least in the beginning she was supportive of the defendant's decision to become a teacher and in the early stages of accomplishing that the children at one point in time had a teenage babysitter.
The plaintiff's opinion was to the effect that the children's age now being what it is that they are capable of looking after themselves for short periods of time.
Incident to her work at Pfizer's, the plaintiff participates in a softball team. She has been involved with a movie group and chorus groups that emanate from the employer.
The plaintiff acknowledged going on a white water rafting trip in September 1999 with co-workers and that upon her return she was met at the airport by a friend and co-employee who delivered certain tickets to her.
The plaintiff testified that there was never an occasion where she struck or assaulted the defendant and that at the most the exchange on her part may have been angry words.
The plaintiff acknowledged that at one point in time the defendant built a deck appurtenant to the home and residence. The plaintiff indicated that she felt that the defendant improvidently spent money on gifts.
The plaintiff's position is to the effect that the defendant should do more financially in terms of supporting his children. She acknowledged that the children appear to be happy and do not see or observe any discord between the parties.
The plaintiff's attitude was to the effect that the reason that the defendant does not work during the summer vacations was so that he could spend that time with his neighborhood friend.
The plaintiff acknowledged that in her words being distraught and vulnerable that there was an indiscretion with a co-worker which occurred however after the separation of the parties.
It would appear that the plaintiff has a highly technical and stressful position involving travel requirements and obligations to many different CT Page 15732 facets or departments in the technical arena in which she works.
From the testimony of the witness Wayne Gilbert of Jewett City, the court finds that Mr. Gilbert resides near the former home of both the plaintiff and the defendant and has been a neighbor to them since 1989.
He has maintained a friendship with the plaintiff and the defendant. This witness is presently serving in the US. Navy.
The witness testified that he has observed the defendant and his friend Robin together frequently. In the witness' words, he noticed a close relationship between the defendant and Robin starting three years ago.
From the testimony of the witness Cathleen Barnes of Jewett City the court finds that Cathleen Barnes is a close neighbor to the former joint home of the plaintiff and the defendant and has been a neighbor since 1996. This witness is familiar with Robin's family. The witness testified that when she first became acquainted with the defendant that she thought that Robin was the defendant's wife.
The witness testified that she frequently sees the defendant and his friend Robin together. In this witness' opinion, she testified that she felt the defendant and Robin spent too much of their time together. The witness noted that Robin has children. The witness is an activity director at a nursing home.
This witness testified that she had spoken with the plaintiff with regard to her concerns as to the relationship between the defendant and Robin.
From the testimony of the witness June Babbitt of Griswold, the court finds that Mrs. Babbitt has been a neighbor to the plaintiff and the defendant since 1992 and has a nine-year old son who apparently participates in neighborhood activities. This witness is employed by the State of Connecticut Child Support Division.
The witness testified that she has been friendly with the plaintiff and the defendant, that her son plays with the defendant's children. This witness has spent hours with the defendant watching neighhorhood children at play.
The witness Babbitt described the defendant as being the primary care giver on the basis of her observations, indicated that the defendant was very involved in his two children's lives. This witness described the defendant as "Mr. Mom". CT Page 15733
The witness has observed the defendant and his friend Robin together. She indicated that she has observed the defendant prepare meals for the children, described her relationship with the plaintiff and the defendant as that of good neighbors, and indicated that on some occasions the defendant has spent the night at her home.
From the testimony of the defendant the court finds that the defendant is age 39, that he grew up in New Rochelle, New York, attended Manhattan College in New York City.
In 1983 the defendant received a degree in electrical engineering and shortly hereafter started employment with the Naval Underseas Laboratories situated in the New London/Groton area.
Initially the defendant lived in Noank and then in Uncasville.
In September of 1988 the defendant moved with the plaintiff to the present home.
The defendant indicated that initially the plaintiff was reluctant to start a family and that after the birth of the two girls that the plaintiff indicated a desire not to have an expanded family.
The defendant's testimony was to the effect that as a result thereof he underwent a vasectomy. After the birth of the two children, the defendant testified, he took a four-month leave and he claimed to be the primary care giver as to the children.
The defendant's position is to the effect that he has given up a career in electrical engineering and advance aspects thereof to care for the children.
It was the defendant's position that after the children were born that the plaintiff became, in his words, "career advancement oriented".
The defendant testified that he participated in household activities, cooking, cleaning, and matters of like nature, and that, in his words, he "loved every minute of it."
The defendant received a teaching certificate in 1985 but did not begin teaching until 1997.
The defendant acknowledged that on many occasions he would be the only male person with regard to the gathering of neighborhood female parents but apparently enjoyed his role in that respect. CT Page 15734
In February of 1997 the defendant began teaching in the town of Voluntown.
The distance between the defendant's home and the school that the children attend is only about two miles.
The defendant professed that he greatly enjoys his job in the teaching arena.
The defendant testified that initially the plaintiff was unhappy with her position at Pfizer's but after joining outside activities his opinion was to the effect that the plaintiff appeared happier.
The defendant testified that when the plaintiff returned from the white water rafting trip that he had misgivings as to her conduct and he attended at the airport where the plaintiff was to arrive and observed her being met by a friend by the name of Hayden.
On one occasion while the parties were in New York visiting the defendant's mother, the defendant represents that the plaintiff said that she did not care for him anymore and was desirous of petitioning for a dissolution of the marriage.
The plaintiff and the defendant attended two counseling sessions.
It is the defendant's position that the plaintiff never mentioned or complained about his relationship with Robin.
While the parties were residing together, the defendant initiated the installation of a pool on the premises and the building of a deck, which was apparently widely used by the neighborhood children.
Apparently as a result of the accumulation of credit card debt in April of 1999 by the defendant, the plaintiff set up a separate checking account and the defendant claimed that he was unaware of this until August of 1999.
The defendant testified that he is not presently able to borrow against his thrift savings plan which is in the neighborhood of $49,000.00.
The defendant's testimony was to the effect that the original purchase price of the 29 Pequot Trail home was $130,000.00. An appraisal has been submitted as an exhibit which the court will touch on in due course.
The defendant does request periodic alimony from the plaintiff. CT Page 15735
The defendant acknowledged, in response to a question by counsel, that if he had remained with the government service that his earnings would probably be at the present in the neighborhood of $60,000.00 annually.
The defendant acknowledged that in the event that he was teaching in a different geographical district that he might earn as much as $40,000.00 annually.
The defendant feels that he and the plaintiff have, in his words, "different or divergent perceptions of life".
The defendant acknowledged that there were multiple telephone calls or contacts between himself and his friend Robin. He acknowledged that he goes to the movies with her and gives her hugs and that on occasion they have gone off together but the defendant denies that a romantic relationship exists.
The defendant acknowledged that there was a teacher's retirement fund of between $3,000.00 and $3,500.00 which was not reflected on his financial affidavit.
As concerns the aforementioned white water rafting trip, the plaintiff brought home a video tape of that trip and showed the same to the defendant and the children.
The defendant indicated that he does not wish to leave the teaching profession. His position is to the effect that the children are tied to their present home and want to stay there and he acknowledged that since 1996 he has not worked during the summertime.
The two girls issue of this marital relationship apparently are doing well in school, both in the sixth grade in the Griswold Intermediate School. The children are in good physical health and on the basis of the testimony, it would appear that they are emotionally well adjusted.
From the testimony of the witness Paul Murgo, the court finds that Mr. Murgo is a vocational rehabilitative counselor and has followed that pursuit and calling for the last 27 years. The witness Murgo assists people in re-entering the workplace, he does vocational inquiries.
Counsel for the plaintiff and the defendant stipulated to the effect that the witness Murgo should be treated as a qualified expert witness. This witness assessed the vocational ability of the defendant. He did a vocational background of the defendant. He reviewed the defendant's resume, he noted that the defendant had graduated in 1983 with a bachelor of electrical engineering degree, subsequently earned a teaching CT Page 15736 certificate and a master's degree.
The witness' review of the defendant's academic record indicated that he had a 3.9 grade average in educational endeavors. The defendant's work history was reviewed by this witness and he noted the defendant's present employment as a teacher in grades 3 and 4 in the town of Voluntown with earnings of approximately $28,000.00 a year.
The witness Murgo noted the defendant's earlier employment in naval warfare at the Underwater Laboratories of the Navy in the New London/Groton area where his earning were in the $50,000.00-$60,000.00 range.
When the undersea project was relocated to Rhode Island, the witness testified the defendant was not inclined to make the move. The defendant received honors grades for his work at the undersea laboratory with the Navy. The defendant had been with the naval facility for 13 years.
This witness researched available jobs for electrical engineers and the compensation incident thereto.
The witness' estimate as to the defendant's potential at this juncture for employment in the field of electrical engineering was to the amount of $58,720.00 a year.
This witness testified that the statewide average for elementary school teachers in the State, the median figure is $47,630.00 with four years experience or more.
From the exhibits the court makes the following findings.
Plaintiff's Exhibit 1 entitled "Agreement" dated June 23, 2000 sets forth in considerable detail the agreed parenting arrangement with regard to the two minor children Nicole and Megan.
It is to the effect that the parties will share joint legal and physical custody of the children in what is described as a true shared arrangement.
The school year schedule is set forth therein, broken down into week one, week two, week three, week four, the summer schedule, additional time and matters of like nature and signed by the plaintiff and the defendant and their respective attorneys.
The court will set forth the agreement verbatim in the orders that it will cuter. CT Page 15737
Plaintiff's Exhibit 2 is the vocational assessment employability evaluation and earning capacity regarding the defendant Michael Creaturo performed and authored by Paul F. Murgo, the expert witness, who testified in these proceedings. It is a detailed assessment covering the defendant's work history, education, employment status, employability, earning capacity, and it appears that on the basis of this exhibit and the testimony of the witness Murgo that the median mid-point annual earning for an electronic engineer for 1998 was $62,660.00.
The middle 50% mark in that category was anywhere between $47,080.00 and $80,160.00.
The exhibit indicated that the starting salary for an electrical engineer with Mr. Creaturo's background would be substantially in excess of what individuals going into the field might initially experience mindful of his 13 years of service.
Plaintiff's Exhibit 3 is the resumé of the defendant Michael Creaturo setting forth his education, professional experience, honors, awards, activities, references and matters of like nature.
Plaintiff's Exhibit 8 is an appraisal of the real estate known as 29 Pequot Trail in the town of Griswold. The estimated market value of the property as of November 10, 2000 was $147,000.00 on the basis of this exhibit, the exhibit being done by Appraisal Associates of New England.
Plaintiff's Exhibit 9 is a settlement statement between the plaintiff, Kathleen Creaturo, and her lender as concerns premises known as 21 Chiou Drive. This settlement statement indicates that the plaintiff paid $195,900.00 for the property with a mortgage loan thereon of $186,105.00.
See Defendant's Exhibit 5, a document entitled Minimum State Ranking with regard to various and sundry towns in Connecticut including the town of Voluntown and indicating apparently the starting salaries or median salaries that exist. It appears that Voluntown is at the lower end of the list on the basis of that exhibit.
See Plaintiff's Exhibit 14, a very detailed financial affidavit created by the plaintiff with regard to income and expenses for the period 10/1/99 to 11/6/2000 including monthly income, outgo, transfers, deficits, an itemized detailed listing of date of each expenditure and the purpose thereof. This exhibit consists of 14 pages of detailed financial data showing expenses and income with regard to the home of the plaintiff and the defendant prior to separation and reflects the CT Page 15738 plaintiff's use of her funds.
See Defendant's Exhibit 7, a detailed breakdown statement from the plaintiff's employer Pfizer indicating compensation, the rate thereof, the nature and extent of deductions for taxes and other matters, and compensation through the period reflected on the exhibit.
See Defendant's Exhibit 10, a stipulation dated July 10, 2000 as concerns the agreement with regard to the $20,000.00 withdrawal from the plaintiff's SIP 401K to enable her to embark upon the purchase of the home that she now occupies.
Defendant's Exhibit 11 is a copy of the August 10, 2000 pendente lite motion for contempt and accounting, which has already been averted to in the review of the file portion of this memorandum of decision.
See Plaintiff's Exhibit 14, the original of the breakdown of the financial affidavit provided by the plaintiff involving itemized figures as to income, outgo, transfers and expenditures in excruciating detail.
See Plaintiff's Exhibit 11A, a form pertaining to outstanding options as concerns the plaintiff with regard to her employment at Pfizer's and the opportunity to exercise stock options and the option price, grant date and matters of like nature shown thereon.
See Plaintiff's Exhibit 15, a breakdown of phone charges from Sprint with regard to the Creaturo home phone and the calls made by the defendant allegedly, at least in part, to his friend Robin. This Exhibit 15 consists of five pages of itemized phone calls. As best the court can devine, the majority thereof being between the defendant and his friend.
See Defendant's Exhibit 6, a statement from Fidelity Investments, an investment report, as concerns the plaintiff and the defendant and the nature of the account.
Reference is made to Plaintiff's Exhibit 7, State of Connecticut State Teacher's Retirement Board as concerns the defendant.
Exhibit 7 is a summary of account dated June 30, 1999.
Plaintiff's Exhibit 7A is a similar summary of account as of June 30, 2000.
In the 7A exhibit, the cumulative amount in this account for the defendant is to the amount of $3,361.95. CT Page 15739
Exhibit 7A contains the words "minimum of 10 years of Connecticut service is required to be eligible for vested monthly benefits".
Reference is made to Defendant's Exhibit 8, which is the statement as concerns the plaintiff with regard to options incident to her employment indicating the grant date, option price, initial exercise and shares outstanding.
On the basis of that exhibit it would appear that the next outstanding exercise date would be February 2001.
Reference is made to Plaintiff's Exhibit 10, which is entitled Savings and Investment Plan On-Demand Accounts Statement concerning the plaintiff Kathleen Creaturo. It covers the activity from July 1, 2000 through July 24, 2000 and indicates the total balance as being to the amount of $49,659.72.
See also in Plaintiff's Exhibit 10 an account statement for activity July 1, 2000 through September 30, 2000 indicating the closing balance at that time as being $32,123.48.
See Plaintiff's Exhibit 12 the plaintiff's stock option value sheet indicating that the current value reflected thereon is to the amount of $14,199.44; this on the basis of the number of shares outstanding.
See Plaintiff's Exhibit 11 entitled the Pfizer Stock and Incentive Plan concerning the plaintiff indicating the cost to exercise the option benefits as of December 31, 1999 was to the amount of $33,930.96.
From the financial affidavit of the plaintiff the court notes that her occupation is that of an information technician at Pfizer's, that her gross weekly wage is to the amount of $1,709.61. Itemized deductions as set forth on a separate schedule including federal tax, FICA, medicare, life insurance, savings plan, legal plan, charity, SIP and matters of like nature amount to $734.39 for a net weekly wage of $975.22.
The plaintiff's weekly expenses as reflected upon the financial affidavit are to the amount of $1,418.42.
The plaintiff's affidavit reflects that she has debt to the amount of $30,651.00. This total is made up of credit card debt, an appliance debt and monies lent to the plaintiff by her sister Giselle Spinacci for counsel fees. This debt does not include mortgage debt.
The plaintiff values the real estate at 29 Pequot Trail in Jewett City at $148,000.00, total mortgage obligation consisting of a first and CT Page 15740 second mortgage to the amount of $90,951.00, for an equity of $57,049.00. The property at 27 Chiou Drive in Jewett City recently purchased to be the home for the plaintiff is valued at $200,730.00, a mortgage of $186,105.00, for a net equity of $14,625.00.
The plaintiff has a 1999 Mitsubishi automobile valued at $14,500.00, with a loan balance of $11,685.00, for a net equity of $2,815.00; household furnishings (both houses) are listed at a value of $15,000.00: checking account balance, $500.00: Pfizer stock options, $14,199.00; Pfizer SIP, $32,797.00 and the Pfizer Defined Benefit Plan, $3,500.00, for a total cash value of all assets of $147,985.00 according to the financial affidavit.
From the defendant's financial affidavit, the court notes that the defendant is a teacher with the Voluntown Elementary School system. His gross weekly wage is $541.00, total deductions including retirement contribution, $168.00, for a net weekly wage of $373.00.
The defendant shows weekly expenses of $907.00, debt in the amount of $32,251.00, credit card and attorney's fees.
The defendant values the property at 29 Pequot Trial at $110,000.00 with a mortgage debt of $91,000.00 for an equity of $19,000.00.
The defendant has a 1995 Ford Windstar vehicle free and clear, valued at $6,000.00. He has $780.00 in a checking account, $17,000.00 in a Fidelity Investment account. The defendant has a Thrift Savings plan valued at $49,000.00, for a total asset value of $91,780.00.
Attached to the defendant's financial affidavit is a Schedule A, weekly expenses. Some of said weekly expenses are to the following effect, mindful of the testimony, the hours required each day at his school position and the fact that he has the entire summer free from any employment; cleaning services, $25.00; entertainment, $28.00; vacation, $39.00; gifts, $56.00; sports activities, $12.00; the total of this Schedule A is to the amount of $373.00 which is exactly the total of the defendant's net and does not take into account all of the substantial items reflected on the face of his financial affidavit.
 Discussion
The issues presented to the court in this proceeding involve a marriage of 15 years.
There are two twin girls issue of this marriage who are now 11 years old. They will be 12 on September 7, 2001. CT Page 15741
From the testimony it would appear that the children are doing well, emotionally adjusted to the situation involving their parents and academically gifted.
Both the plaintiff and the defendant are highly educated individuals. Both have degrees in electrical engineering, a high tech education.
The health form indicates that their education in each instance extends beyond receiving degrees in electrical engineering and that both have master's degrees.
There are two households being maintained; one at 29 Pequot Trail and the other one on Chiou Drive.
It would appear that both of the parties are relatively young and both enjoy good health.
The court is presented with a situation where admittedly on the basis of the findings of the court and the exhibits allowed that the plaintiff petitioner's income is manifestly substantially in excess of what the defendant's is.
The testimony would tend to indicate that the defendant in fact has an excellent relationship with the children and that there is a commendable bonding between himself and the children and that he in effect has structured his life at this point and for several year priors thereto to be, so to speak, the home person and as characterized by one of the witnesses "Mr. Mom".
The court feels on the basis of the testimony that the defendant's course is well intentioned notwithstanding the very substantial reduction in financial income that has been occasioned by his leaving relatively high paying positions in electrical engineering and allied issues and taking a position as an elementary school teacher in the town of Voluntown.
The defendant's attitude and course of conduct with regard to endeavoring to nurture the children and be there almost as an at-home parent is commendable but some consideration ought to be given to the disparity of the financial positions of the parties whereby the plaintiff is the primary financial engine in this picture.
The plaintiff in the court's opinion has been candid. She acknowledged an indiscretion occurring after the parties had separated or in any event after the petition for dissolution was initiated. CT Page 15742
The defendant however would have the court accept the proposition insofar as his relationship with Robin is concerned as it being purely platonic. The court on the basis of the record which has been set forth in the findings finds this difficult to accept. Admittedly there was no direct evidence of physical indiscretion insofar as the defendant is concerned but the court believes that at least in some measure his friendship with the lady has contributed to the breakdown of the marriage.
The court is mindful of the comment by the plaintiff while in New York at the residence of the defendant's widowed mother but feels that the situation cannot be looked at in an isolated way having in mind that the activities of the plaintiff and the defendant occurred over a much more substantial time frame than just that one instance.
It would appear that the plaintiff has tried to be financially responsible. It appears that the defendant did run up considerable credit card debt which caused the plaintiff concern and which the plaintiff undertook to pay off and discharge, even if done on a periodic basis.
While the court in no way questions the defendant's conduct in terms of being a caring and thoughtful parent, some thought ought to be given at least with regard to the defendant's freedom from teaching activities during the summer months in order that the financial relationship between the plaintiff and the defendant might be somewhat more balanced.
In addition, on the basis of a careful examination of the respective financial affidavits, for the defendant to ask the court to accept the separate schedule attached to his financial affidavit including items such as $56.00 a week for gifts, whereby that schedule total the entire amount of his income suggests an unrealistic approach on his part notwithstanding his devotion and affection to the children. Both parties of course must recognize the necessity for financial stability both for themselves and for the children.
In addition, the court notes that the two girls who apparently are academically gifted are 11+ years of age and while the defendant and his counsel properly bring to the court's attention that the court must consider issues as they exist at the present time, the children are rapidly approaching a point in life where they will be more self-sufficient merely by virtue of the passage of time and perhaps require somewhat less in the way of intensive direction. That is not to suggest that there should be any lack of guidance by the plaintiff or the defendant with regard to putting the children's feet on the right path. CT Page 15743
In view of the economic courses that each have adopted, it is fortunate that the plaintiff has done as well as indicated by the testimony and the financial affidavits. For if that were not the case the financial shoe would pinch much more closely if a greater degree of reliance was placed upon the defendant's earnings which are extremely modest under the circumstances in contrast to what his earnings might be if he had remained in the electrical engineering field. The court of necessity cannot require the defendant to seek other employment or follow a different course. His participation in the field of education is laudable and undoubtedly at this point is in the best interest of the children; however, the defendant perhaps might wish to reflect upon the age of the children and their relatively near-term requirements including education, having in mind that as the court has indicated on many occasions "a parent is forever".
The court is also mindful of the Agreement, Plaintiff's Exhibit 1, with regard to the shared parenting arrangement and while a careful examination of the same may reflect that the children are with the defendant to a somewhat greater extent, the time frame accorded to the plaintiff is not insubstantial.
In her testimony the plaintiff petitioner indicated to the court that she makes no claim for alimony as against the defendant.
The testimony by the plaintiff as concerns what she described as physical harassment suggests an inappropriate course of conduct on the part of the defendant. The plaintiff's testimony appeared to be candid and straightforward and was not controverted in any meaningful way by the defendant.
The defendant's position would appear that he has the primary responsibility for the welfare, guidance, education and direction of the children and does not appear to take into account on the basis of the agreement that is outstanding that in fact the plaintiff mother is an important and integral part of the relationship and there is no indication she has less than an abiding love and affection for the two girls.
The court has carefully considered the responses made to the court on inquiries put to her; this being Attorney Krista Dunn.
It would appear that the plaintiff is working as hard and diligently as possible under a very responsible and stress oriented position. There is no reason to conject that the plaintiff is doing anything less than her best efforts financially. CT Page 15744
 The Law
The court has considered all of the statutes which apply in matters of this nature which include without limitation Connecticut General Statutes (C.G.S.) § 46b-62 regarding attorney's fees, C.G.S. § 46b-82
regarding alimony and C.G.S. §§ 46b-55, 46b-83 and 46b-84 as concerns support.
The court has considered all of the applicable case law that govern the matter.
The court has considered the testimony of the parties, their candor or lack thereof, and all exhibits and the arguments of counsel.
In considering the issue of alimony, the court has considered the length of the marriage, the cause of the dissolution, the age, health, station, occupation, employability, estate and needs of the parties.
The court has considered the standards of living of the parties.
As concerns the minor children, the court has considered the children's age, moral character, child care practices, emotional ties of each parent to the child, length and intimacy of the association with the parents and the physical and mental health of the children.
The court has considered the time available as to each parent for the children on a daily basis, the capacity and disposition of both parents to give affection and guidance, to provide financial security, education and religious training.
The court has considered the respective financial positions of the plaintiff and the defendant, their prospects for future income and opportunities.
The court has considered the issue of fault.
While the court cannot order the defendant to find a better job that is more suitable to his qualifications, the court can impute the earning capacity to the child support obligation or in considering the balance of the orders as between the parties.
Under the Child Support Guidelines, the child support obligation first is determined without reference to earning capacity. An earning capacity becomes relevant only if a deviation from the guidelines is sought under 46b-215a-3(b)(1). Pursuant to 46b-215a-3(a), the amount of support determined without reference to the deviation criteria is presumed to be CT Page 15745 the correct amount of support and that presumption may only be rebutted by a specific finding on the record that the application of the guidelines would be inequitable or inappropriate under the circumstances of a particular case.
When the latter is true, 46b-215a-3(b)(1) allows deviation from the guidelines on the basis of a parent's earning capacity citing Unkelbachv. McNary, 244 Conn. 350 (1998).
In marital dissolution proceedings under appropriate circumstances the trial court may base financial awards on the earning capacity rather than the actual earned income of the pal-ties citing Lucy v. Lacy, 183 Conn. 230
(1981), Miller v. Miller, 181 Conn. 610 (1980), when, as in this proceeding, there is specific evidence of the defendant's previous earnings.
The court acknowledges that in these proceedings there is no evidence of a voluntary quit or an avoidance in obtaining employment in his field of an intentional nature so as to avoid orders of the court. See alsoSchmidt v. Schmidt, 180 Conn. 184 (1980). See Hart v. Hart,19 Conn. App. 91 (1989).
Earning capacity in this context is not an amount which a person can theoretically earn nor is it confined to actual income but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health.
The court recognizes a parent's child care responsibilities as a factor that may affect earning capacity.
The weight to be given any evidence and the credibility incident thereto of any witnesses are within the sole province of the trial court which has the opportunity to view the evidence presented in a totality of circumstances. See Broderick v. Broderick, 20 Conn. App. 145 (1989). See also Gamm v. Gamm, Superior Court Judicial District of New Haven, Docket No. 0363542, August 3, 1989, Axelrod, J., with regard to the court's determination of potential earning power as concerns an attorney in those proceedings.
From Section 46b-215a-3, Child Support Guidelines Deviation Criteria (b), the section reads as follows: "In some cases a parent may have financial resources that are not included in the definition of net income but could be used by such parent for the benefit of the child or children or for meeting the needs of the parent. The following resources may justify a deviation from presumptive support amounts (b) the parent's CT Page 15746 earning capacity.
As concerns the defendant's request for alimony, the matter of Hopfervs. Hopfer, 59 Conn. App. 452 (August 2000) is helpful. As concerns the request by the defendant's counsel for attorney's fees, see Sachs v.Sachs, 60 Conn. App. 337 (October 2000).
The purpose of the court touching on issues with regard to earning capacity mindful of the defendant's circumstances is solely for the purpose indicating that the court has carefully reflected on this issue.
As indicated earlier, the court cannot mandate that the defendant give up his job as a teacher but as concerns certain financial issues between the parties, the fact that as time goes by the two twin girls will become more mature and particularly the issue of the defendant having the entire summer for his own pursuits suggests that this is an issue which has carefully been reflected upon by the court.
It would seem to the court that at least during the summer months, mindful again of the age of the children, that the defendant might reasonably be expected to try to make some effort in the employment arena with regard to securing more income which would help not only the defendant but the children and perhaps strike a happier balance as between the obligations and burdens of the plaintiff and the defendant respectively.
The court has considered the citations in the defendant's trial brief in arriving at the subsequent orders; particularly, DeAngelis v.DeAngelis, FA98-0357587S, and Morris v. Morris, FA96-0389510 (1997).
With regard to pension rights and the vesting thereof, the court has considered Wendt v. Wendt, 59 Conn. App. 656 (September 2000). This would include the consideration of stock options as well.
As concerns the valuation of the two parcels of real estate, the defendant in his trial brief suggests that "the failure of similar homes in the immediate neighborhood to sell should be taken into account by the court". There was no evidence of which the court has any recollection of any credible testimony in that respect and the court feels it should be guided by the appraisal.
Among the enumerated deviation criteria set forth in the general principles of the guidelines is the "present and potential earning capacity of a party".
This reflects the well reasoned family law principal that in a marital CT Page 15747 dissolution proceeding the court may base financial awards on the earning capacity rater than the actual earned income of the parties. Miller v.Miller, 181 Conn. 610 (1980).
The Court enters the following orders.
The parties shall share the joint legal and physical custody of their two minor children in a shared arrangement of the children's quality time and shall share decision making in regard to the children, Nicole and Megan.
The parenting agreement during the school year shall consist of a four-week rotation as follows:
Week One: Sunday 8:00 p.m. through Thursday 5:00 p.m. with father and Thursday 5:00 p.m. through the following Sunday at 8:00 p.m. with mother.
Week Two: Sunday 8:00 p.m. through Wednesday 5:00 p.m. with father and Wednesday 5:00 p.m. through Saturday 9:00 a.m. with mother.
Week Three: Saturday 9:00 a.m. through Thursday 5:00 p.m. with father and Thursday 5:00 p.m. through Sunday 8:00 p.m. with mother.
Week Four: Sunday 8:00 p.m. through Wednesday 5:00 p.m. with father and Wednesday 5:00 p.m. through Friday 5:00 p.m. with mother at which time father will have children for the remainder of Week Four with rotation back to Week One commencing Sunday 8:00 p.m.
Summer Schedule: Each parent shall have the opportunity to exercise two weeks of uninterrupted vacation time. of the remaining six weeks the children shall be with mother for four of the six weekends beginning Thursday 5:00 p.m. and ending Sunday 8:00 p.m. Accordingly the children shall be with the father on the remaining two weekends.
Additional Time: School Vacation, December, February, April shared by mutual agreement. Mother shall extend her weekend visitation until Monday 8:00 p.m. when a Monday holiday follows her scheduled weekend.
Each parent shall have the opportunity to attend all extracurricular activities in which the children participate.
Each parent shall have additional time with the children by mutual agreement only.
Each parent shall provide the other with the right of first refusal to care for the children when either is unable to do so during their CT Page 15748 scheduled time.
This order as to custody and access embodies the agreement undertaken and approved by the plaintiff and the defendant and their respective counsel and the attorney for the minor children all as reflected on Plaintiff's Exhibit 1.
Support for the two minor children shall be in the amount of $260.00 a week payable to the defendant from the plaintiff.
Each of the parties are to maintain health insurance coverage for the benefit of the two minor children as available through their employment.
The plaintiff shall pay 60% of any unreimbursed health expenses for the children and the defendant shall pay 40% of any unreimbursed health expenses.
As concerns the issue of alimony, the plaintiff wife has indicated to the court that she makes no request for alimony.
The defendant husband requests alimony for a period of seven years.
On the basis of the content of this memorandum of decision and the respective existing financial positions of the parties and the educational qualifications of each, the court enters no order as to alimony as to either the plaintiff or the defendant.
The plaintiff may retain her ownership of the residence at 27 Chiou Drive in Griswold. The title to this property stands in the name of the plaintiff alone and the defendant is not obligated in any way as concerns any indebtedness, mortgages or liens thereon.
According to the testimony, the equity in the 27 Chiou Drive, Griswold property amounts to $14,600.00±.
As concerns the real estate known as 29 Pequot Trail, which is valued at $148,000.00, less mortgage debt of $90,951.00, the plaintiff shall execute a quitclaim deed conveying all of her right, title and interest in the property to the defendant and in consideration thereof, mindful of the equities that exist, the defendant shall thereafter execute a mortgage in favor of the plaintiff in the amount of $15,000.00 with interest at the rate of 5% annually. The same to be paid upon any of the following events: the defendant's death, his sale of the home, his remarriage or the graduation of the twin girls from high school or their attaining age IS, whichever may first occur. CT Page 15749
The plaintiff may retain title to the 1999 Mitsubishi motor vehicle and be responsible for any debt or obligation thereon.
The defendant may retain the 1995 Ford Windstar motor vehicle which is free and clear and is in his name.
Each party may retain the household furnishings, personal items, clothing and effects that are presently in their respective residences and possessions.
The plaintiff may retain the modest amount shown in her Ledge Light Credit Union checking account and Ledge Light Credit Union savings account, which according to the financial affidavit is $500.00.
The plaintiff may retain her Pfizer stock options, which according to the financial affidavit have a value of $14,199.00.
The plaintiff may retain her Pfizer SIP which according to the financial affidavit amounts to $32,797.00 and the defined benefit plan of $3,500.00.
The defendant may retain his accounts in People's Bank, savings and checking, Jewett City Savings Bank, which according to his financial affidavit amount to approximately $780.00.
The defendant may retain his Thrift Savings Plan valued according to the financial affidavit at $49,000.00.
The defendant may retain his teacher's retirement account fund in the amount of $3,300.00.
Each party shall be responsible for their own attorney's fees.
Each party shall be responsible for the balance owed to Attorney Krista Dunn, counsel for the minor children, as reflected on the affidavit of debt dated November 21, 2000.
The plaintiff and the defendant may each maintain their own individual health insurance without contribution; one from the other.
The plaintiff and the defendant shall continue to maintain their employer-related life insurance naming the two children as irrevocable beneficiaries during their minorities.
The parties shall share equally the dependent's exemptions for the two minor children; one exemption to the plaintiff and one exemption to the CT Page 15750 defendant for federal and state income tax purposes.
Each party shall pay the debts that are reflected on their respective financial affidavits.
The court grants the relief prayed for.
The marriage of the parties is dissolved pursuant to the provisions of the statute and each is declared to be single and unmarried.
Mindful that the issue of support for children can always be brought to the court's attention, should the defendant's financial circumstances change after the expiration of his current teaching contract, the issue may be revisited.
Austin, JTR